UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

ERNEST OLIVER

                 Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF CORRECTIONS, LYNELLE MAGINLEY-LIDDIE, JOSEPH CAPUTO and JOHN and/or JANE DOES 1-10.

                 Defendants.

-----------------------------------------------------------X

Index No. 1:25-cv-03516

**VERIFIED COMPLAINT**

    Plaintiff Ernest Oliver ("Ernest") by and through his attorneys, Bader & Yakaitis LLP, as and for his Verified Complaint (the "Complaint") brings this action against Defendants New York City Department of Corrections ("NY DoC"), Lynelle Maginley-Liddie ("Liddie"), Joseph Caputo ("Caputo") and John and/or Jane Does 1-10 ("Doe Defendants" together with NY DoC, Liddie, and Caputo "Defendants") hereby alleges as follows:

**PRELIMINARY STATEMENT**

    1.    Ernest is a young man of 22 and an inmate at the Rikers Island Prison Complex ("Rikers"). Ernest was prescribed medication by Rikers medical personnel that is known to cause ischemic priapism, a painful uncontrollable erection that cannot desist without medical intervention. Ischemic priapism is a medical emergency with each hour ticking by leading to permanent damage of the genitalia. Ischemic priapism must be treated immediately for any

positive outcome. Instead, Ernest Oliver has suffered permanent disfigurement from Defendants' failure to provide Ernest with necessary medical attention.

2. Ernest suffered an ischemic priapism which went untreated for *several days* despite regularly informing Rikers personnel of his condition.

3. Ernest was ignored and Rikers personnel allowed the ischemic priapism to continue untreated for over *five full days*. During that time the priapism was not treated, Ernest was in agony, unable to sleep, and barely able to stand or walk.

4. An ischemic priapism is a medical emergency which must be treated within hours, not days, of the onset of symptoms to avoid permanent damage. Rikers personnel failed to provide the necessary medical care in the face of this emergency to Ernest leading to permanent erectile dysfunction and substantial permanent damage to the soft tissue in Ernest's genitalia.

5. Worse still, after Ernest was finally treated, it became known among Corrections Officers ("COs") that he suffered from permanent erectile dysfunction, several COs mocked his condition making jokes at Ernest's expense that he would no longer be a problem because his "dick" did not work.

6. Rikers is notorious for its many human rights failures, including, COs regularly failing to respond to medical emergencies. Given the common occurrence of COs failing to respond to medical emergencies there must either be a custom or policy in place to ignore inmates' medical requests or a general failure of training among COs who work at Rikers. Without such failings, these problems could not be as endemic as they are.

7. While this is merely an example of a broad societal problem, Rikers has effectively sterilized a young man of only 22 years of age, one who no matter the reason for his incarceration did not deserve such treatment by the State.

## PARTIES

8. Ernest is an inmate at Rikers Island. During the events described herein, Ernest was a resident of the Robert N. Davoren Detention Center at 11-11 Hazen St, East Elmhurst, NY 11370.

9. The New York City Department of Corrections ("NY DoC") is an administrative agency which has jurisdiction over New York City's correctional facilities, including but not limited to Rikers. NY DoC is headquartered at 75-20 Astoria Blvd S, East Elmhurst, NY 11370 in Queens County.

10. Lynelle Maginley-Liddie ("Liddie") is the Commissioner of the NY DoC. Liddie is being sued in both her individual and official capacity.

11. Joseph Caputo ("Caputo") is the Warden of the Robert N. Davoren Detention Center, a sub facility in which Ernest was housed. Caputo is being sued in both his individual and official capacity.

12. John and/or Jane Does 1-10 are the currently unknown COs and/or Rikers medical personnel who failed to facilitate and/or provide the proper medical care to Ernest's medical emergency. Each are being sued in his or her individual capacity and his or her official capacity.

## JURISDICTION AND VENUE

13. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution of the United States and federal statute 42 U.S.C. 1983.

14. Venue is proper pursuant to 28 U.S.C. § 1391 because the Eastern District of New York is a judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## **FACTS**

15. Ernest Oliver ("Ernest") was born in Brooklyn in December 2002.

16. Ernest is an inmate at Rikers which is controlled by the NY DoC with NYSID 14414928M and a Book & Case Number 1412203971. He is currently housed in the George R. Vierno Center, though at the relevant times Mr. Oliver was housed at Robert N. Davoren Center.

17. Ernest was arrested on November 29, 2022, at the age of 19, and expects to leave the care of the NY DoC by the end of 2025.

18. During his stay, Ernest was prescribed 75 mg of Trazodone, and 4 mg of Risperidone.

19. Trazodone is an antidepressant which can be used to treat major depressive disorder. It is also regularly used, off FDA approval, for sleep disorders, although there is not yet sufficient clinical data on this use.

20. Regardless, Trazodone was provided to Ernest partly for its ability to help him sleep while in Rikers but also for its ability to treat depression.

21. Trazodone has numerous side-effects, some more serious than others. A common side-effect for Trazodone is priapism.

22. Such side effects are so common that in psychiatric circles Trazodone is jokingly referred to as "Trazobone" comparing it to slang for erect male genitalia. Trazodone and priapism are commonly associated in the medical community.

23. Risperidone (common brand Risperdal) is an antipsychotic that is used to treat a variety of mood disorders.

24. Risperidone also has numerous side-effects, including priapism, albeit at a lower rate than Trazodone.

25. Recent studies indicate that the combination of the two may increase the risk of priapism at a higher rate than the usage of either on its own.[1]

26. As will be described in greater detail below, Ernest experienced stuttering and then ischemic priapism, caused as side effects from his medication.

27. On most mornings, when Ernest would wake up, he would have an uncontrollable erection for a few hours, usually lasting no more than three hours. This is a condition known as a stuttering priapism. This condition was caused by the medication, i.e. the Trazodone, Risperidone and/or the combination of the two, prescribed to him by NY DoC affiliated medical staff.

28. Ernest reported these issues to NY DoC COs and medical representatives.

29. The possibility of ischemic priapism is a relatively common side effect for both Trazadone and Risperidone. NY DoC should have known that providing such medication to an inmate generally could result in the occurrence of a predictable side-effect, namely ischemic priapism. The risk of ischemic priapism is also greater in individuals who experience stuttering priapism.

30. Trazadone and/or Risperidone are common medications among the inmates at Rikers. NY DoC failed to properly train their staff regarding possible medical emergencies that could occur from the regular distribution of Trazadone and/or Risperidone.

31. NY DoC maintained a medical file on Ernest, who, because of his status as an inmate, was not able to receive medical treatment without the intervention of the NY DoC and Rikers personnel.

---

[1] Chelsea Eisenach, M.D. and Sean Lynch M.D., *Trazodone-Induced Priapism and Increased Recurrence Risk With Antipsychotics*, American Journal of Psychiatry Volume 19, Number 1 September 8, 2023.

## Priapism

32. Priapism is a prolonged erection that is either a full or partial erection that continues hours beyond the norm and is not caused by sexual excitement. There are three main types of priapism ischemic, nonischemic and stuttering.

33. Stuttering priapism is a condition characterized by recurrent episodes of prolonged erections that are not associated with sexual stimulation that last for less than 4 hours and resolve spontaneously.

34. An ischemic priapism, also called low-flow priapism, is the result of the blood not being able to leave the penis. Blood becomes trapped in the penis and cannot flow out of the veins of the penis or alternatively there is a contract of smooth muscles within the erectile tissue of the penis trapping the blood. The trapped blood becomes de-oxygenated and after four hours of being trapped in the penis will cause damage and potentially destroy penile tissue. Untreated ischemic priapism will usually cause permanent erectile dysfunction.

35. Ischemic priapism is a medical emergency and requires immediate medical care to prevent complications caused by the penis not getting enough oxygen.

36. Individuals with an ischemic priapism are likely to make a full recovery if treated within the first several hours of symptoms presenting. At 24 hours after onset there is approximately a 50% rate of full recovery. At 36 the odds of some degree of corporal fibrosis and erectile dysfunction is extremely high, continuing to increase with each hour the condition goes untreated. At five days after onset recovery is extremely unlikely, bordering on impossible.

37. Corporal fibrosis is a condition characterized by excessive accumulation of scar tissue (fibrosis) in the corpora cavernosa, the two spongy cylinders within the penis that fill with blood during an erection.

38. When ischemic priapism is left untreated, penile corporal tissues see the onset of necrosis and eventual fibrosis which will result in permanent erectile dysfunction as the corpora cavernosa lose the ability to fill with blood. In addition, the damaged tissue can, especially in severe cases, lead to permanent penile pain and penile shortening, literally shriveling the interior of penis, along with continued pain in the genitalia.

### Onset of Ischemic Priapism

39. Ernest regularly suffered from stuttering priapism, a condition of which Ernest had appraised Rikers personnel.

40. However, beginning on October 28, 2024 ("Day 1") the stuttering priapism became an ischemic priapism.

41. As was usual, on the morning of Day 1, Ernest woke up with an uncontrollable erection, a symptom of the stuttering priapism caused by his medication. As this was a regular occurrence, he expected the condition and was not initially concerned. Normally the condition would abate after a few hours.

42. However, after several hours, Ernest noticed that his erection did not dissipate. Instead, he noticed increased pain in his genitalia. This indicated that the stuttering priapism had become an ischemic priapism.

43. Concerned, Ernest reported this medical issue to a CO who he believes was Corrections Officer Hall, although he does not know her first name. Officer Hall stated she would report this medical condition and Ernest believes she did so. Ernest reported his condition to at least one other Corrections Officer on Day 1 but does not remember that officer's name and is identified as John or Jane Doe 1.

44. By the end of the day, Ernest received no medical attention.

45. Over the course of the night of October 28, 2024 into October 29, 2024 ("Day 2") the priapism became extremely painful. Ernest was unable to sleep from the pain and discomfort.

46. By the time night became day, Ernest was in excruciating pain. For much of Day 2, Ernest found it difficult to walk or stand and he was mostly huddled in a ball in pain often unable to get off the floor. Ernest spoke with additional COs about his condition, though at this juncture he does not recall the names of those COs. These COs are John and/or Jane Does 2-3. Again, he received no medical attention.

47. By October 30, 2024 ("Day 3"), Ernest's priapism had not subsided. Ernest again attempted to speak to Corrections Officers regarding this medical emergency. His concerns were brought to the attention of a Captain who believed Ernest was lying. The two additional COs are John and/or Jane Does 4-5, and the Captain Jane Doe 6.

48. Ernest called 311 to lodge a formal complaint and to seek medical attention.

49. Day 3 came and went and still Ernest received no medical attention for his priapism.

50. October 31, 2024 ("Day 4") followed a similar pattern. Ernest remained in excruciating pain that made it difficult to walk, stand or sleep. He again spoke to a different set of Corrections Officers and for whatever reason no medical attention was forthcoming. These additional COs are John and/or Jane Does 7-8.

51. November 1, 2024 ("Day 5") saw Ernest in continued pain, sufficient to make walking, standing or sleeping extremely difficult. Ernest again called 311 to lodge a complaint and to seek medical attention.

52. By Day 5, Corrections Officer Hall had returned to work the area in which Ernest lived. She was shocked that Ernest had not yet received medical attention. She again reported Ernest's condition to her superiors. Now finally on Day 5 of constant pain, Ernest was brought to medical facilities at Bellevue Hospital in or around 6:45 pm of Day 5.

53. Despite having an emergency medical condition, there was then substantial delay before Ernest was actually treated.

54. Ernest was finally treated for his Priapism towards the end of Day 5, beginning of November 2, 2024, ("Day 6").

**Treatment of Priapism**

55. The doctors treating Ernest first attempted a cavernosal aspiration and irrigation of the penis ("Irrigation Method"). This procedure requires the medical team to insert a needle into the corpus cavernosum, one of two columns of spongy tissue that runs through the shaft of the penis. With the needle, the doctors then attempt to drain the excess blood out of the penis. Saline can also be used to help irrigate the corpora cavernosa and re-establish proper blood flood. This is important as the blood that has been trapped in the penis has become "stale", i.e. oxygen-deprived and will cause damage to the area around it.

56. Unfortunately, the Irrigation Method failed to alleviate Ernest's priapism as only 20ccs of thick very dark blood was drained and significant resistance was met despite saline and phenylephrine due to the clotted old blood. This is unsurprising in that the longer a priapism goes untreated the harder it will inevitably be to treat. This result is from irreversible damage to the smooth muscle tissue within the penis caused by the lack of oxygen to the issue.

57. The doctors then switched to a more invasive treatment method, the surgical implementation of a shunt ("Shunt Method"). In the Shunt Method, a doctor will slice open the

penis and create a shunt, or channel, to allow the blood to more properly floor. As these shunts need to be installed on each side of the penis to allow effective drainage, so the surgery is performed twice, once on each side.

58. The Shunt Method is a more invasive procedure and requires more substantial aftercare and more likely to create permanent erectile dysfunction than the irrigation method. However, when the Irrigation Method fails, the Shunt Method is necessary.

59. The surgical team suggested that Ernest would need to have a follow up within the next two months or so, and suggested early January 2025 as an appropriate time for a follow up.

60. Regardless, at the time of the competition of the priapism treatment, the doctors at Bellevue Hospital informed Ernest he would almost certainly have permanent erectile dysfunction.

61. Ernest did not receive his first follow up until on or around mid-March. The doctor's do not expect Ernest to recover usage of his penis.

### Return to Rikers

62. After a brief period of recovery at Bellevue Hospital, Ernest was brought back to Rikers.

63. Somehow, the result of Ernest surgery was well known among the COs (despite a complete failure to provide the initial care required).

64. On several instances, COs, including a captain, mocked Ernest for his erectile dysfunction. These COs are John and/or Jane Does 9-10.

65. The captain, who at this time upon information and belief is Captain Valentine, mocked Ernest by stating that he would no longer cause problems for the COs because his "dick" did not work. Such mockery was and is a regular occurrence after Ernest's treatment.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**

66. Ernest repeats, reiterates and realleges each and every allegation contained in the Complaint herein, all with the same force and effect as though set forth fully at this point.

67. Ernest has had his fourth, eight and fourteenth amendment rights violated by Defendants.

68. As an inmate in an NY DoC facility, Ernest is not able to obtain his own medical services.

69. The staff at Rikers were inadequately and improperly trained such as to avoid serious medical complications of its inmates despite the known and likely risk.

70. There exists a general policy and/or custom at Rikers that allows inmate medical emergencies to go untreated.

71. Serious consequences stemming from ignored medical conditions is endemic at Rikers and a simple internet search reveals many such cases including but not limited to that of Eugene Castelle, Layleen Xtravaganza Cubilette-Planco, Charizma Jones, Michael Nieves, Rolando Perez, Herminio Villaneuva, Tarz Youngblood, George Pagan, Herman Diaz, Mary Yehudah and many others. A large class action against the NY DoC makes a similar allegation and found that the NY DoC regularly fails to meet the medical needs of inmates. See *Agnew v. N.Y.C. Dep't of Corr.*,

72. Ernest's priapism was a serious medical need, one that without immediate treatment would have permanent negative health consequences for Ernest.

73. Ernest's risk of priapism was known or should have been known by Defendants.

74. Ernest's medical file was maintained by NY DoC.

75. Upon information and belief, NY DoC failed to properly train its staff by informing them of a likely and common medical emergency from regularly proscribed medication to NY DoC inmates.

76. NY DoC's failure to properly train its staff led directly to Doe Defendants ignoring Ernest's medical emergency and preventing him from being treated in reasonable or timely fashion.

77. NY DoC has maintained a custom and/or policy that encourages COs to ignore medical emergencies of inmates.

78. The failure to treat Ernest's medical emergency has led to permanent disfigurement including permanent erectile dysfunction as well as internal scarring that will decrease the length of his penis as well as permanent pain.

79. Ernest has exhausted all potential administrative remedies.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983)

80. Ernest repeats, reiterates and realleges each and every allegation contained in the Complaint herein, all with the same force and effect as though set forth fully at this point.

81. Caputo, as warden of the Robert N. Davoren Detention Center, was responsible for training the COs within that facility as well as establishing policy and/or customs.

82. Caputo failed to properly train personnel leading to the above enumerated violations of Ernest's constitutional rights.

83. Upon information and belief, Caputo promulgated policies and customs that directly lead to COs failing to intercede with Ernest's medical emergency for five days.

84. Liddie, as NY DoC Commissioner, was responsible for overseeing policy and/or customs at the facilities over which she had control, policies and/or customs that directly led to Ernest's injury.

85. Failure to intercede in a medical emergency for multiple days could only occur because of either a failure of training or policy and/or custom that promotes behavior ignoring medical issues within inmates.

86. John and/or Jane Does 1-10 as COs at Rikers were acting under the color of law and personally deprived Ernest of his constitutional rights by failing to attend to his medical emergency.

87. This failure was exacerbated by the mocking Ernest received from John and/or Jane Does 9-10.

88. The failure to treat Ernest's medical emergency has led to permanent disfigurement including permanent erectile dysfunction as well as internal scarring that will decrease the length of his penis as well as permanent pain.

## THIRD CAUSE OF ACTION
### (NEGLIGENCE)

89. Ernest repeats, reiterates and realleges each and every allegation contained in the Complaint herein, all with the same force and effect as though set forth fully at this point.

90. Defendants owed Ernest a duty to provide him adequate medical care and/or facilitate Ernest's ability to get adequate medical care.

91. Defendants failed to allow Ernest access to adequate medical care by delaying the treatment of his priapism by five days.

92. This delay directly led to permanent disfigurement including permanent erectile dysfunction as well as internal scarring that will decrease the length of his penis as well as permanent pain.

**WHEREFORE**, Ernest demands judgment against the Defendants on the First, Second and Third Causes of Action in an amount in excess of the monetary jurisdiction of all lower courts which would otherwise have jurisdiction of this matter in an amount to be determined at trial but no less than $30,000,000, together with the costs and disbursements of this action, attorneys' fees, punitive damages and any other and further relief to which this Court may deem just and proper.

Date: New York, New York
      June 17, 2025

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK  )
COUNTY OF QUEENS  )

    I, Ernest Oliver affirm this 17 day of June, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
ERNEST OLIVER